Filed 12/21/22  P. v. Quintero CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B312868 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA060104) |
| v. | |
| FRANK EDDIE QUINTERO, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Bruce F. Marrs, Judge.  Affirmed.

Steven A. Brody, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda V. Lopez and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Frank Eddie Quintero (defendant) appeals from the order denying his petition for vacatur of his murder conviction and resentencing, pursuant to Penal Code former section 1170.95, now section 1172.6.[1]  The order followed an evidentiary hearing pursuant to section 1172.6, subdivision (d) and found the prosecution had met its burden to show beyond a reasonable doubt that defendant was not entitled to resentencing. Defendant contends that we review the issue de novo or that the order should be reversed on the ground that it is not supported by substantial evidence.  We find no merit to either contention and thus affirm the order.

## BACKGROUND

In 2003 defendant and three codefendants, Vincent Francisco Lopez, Raymond Salvador Ramirez, and Juan Lucas Soto (collectively, defendants), were convicted of first degree murder committed during the commission of a robbery, as well as two counts of second degree robbery, and one count each of assault with a deadly weapon and conspiracy to commit robbery. The jury found true the robbery-murder special circumstance alleged under section 190.2, subdivision (a)(17).  The jury necessarily found that defendant had acted as a major participant with reckless indifference to human life.  (§ 190.2, subd. (d).)  Defendant was sentenced to life in prison without the

_____

[1]     Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no significant change in text. (Stats. 2022, ch. 58, § 10.)  We will refer to the section by its new numbering only.

All further statutory references are to the Penal Code, unless otherwise indicated.

2

possibility of parole, and the sentences imposed as to the remaining counts were stayed. This court affirmed the judgment on direct appeal. (See *People v. Lopez* (Oct. 6, 2004, B170919) [nonpub. opn.].)

**Relevant trial evidence**

### *August 20, 2002, before the robbery*

Bobby Bionghi, who had lived in the City of La Puente for over two years, was aware of the gangs in his neighborhood, including the gang he belonged to, the Barrio Puente gang. He also knew Soto, Lopez, and defendant as members of the Cadbrook gang and Ramirez as a member of the Dial Street gang, all cliques of La Puente gang that got along with one another.

On August 20, 2002, the defendants unexpectedly visited Bionghi. They arrived in a car belonging to Lorraine Calvillo, whom he had met once or twice. The car pulled up next to Bionghi in his driveway. Soto exited the car first and approached Bionghi and Lopez, who was there. Defendant and Ramirez then got out, while Calvillo remained in the car. While Bionghi and Soto talked about a robbery that was planned, Soto asked Bionghi if he would be interested in being the getaway driver. Bionghi declined as he was on parole and trying to discharge. Bionghi and Soto were about two to three feet away from the other three men, and Soto spoke in a "common loud tone of voice." Soto then opened the car's hood, snapped open an air filter, and pulled out a nickel plated .357 six-shot revolver. Bionghi had a clear view of two other weapons, both black and smaller than the revolver, in the space. One looked like a .32- or .25-caliber semiautomatic, and the other appeared to be a .380-caliber semiautomatic.

After Soto had taken out the gun and they finished talking, but were still standing in the same place, Lopez then spoke briefly with Bionghi about a store in El Monte on a busy street corner and mentioned "the tax income quote [*sic*] fund raising type of business" around the corner from Bionghi's residence. Lopez said there was a fundraising box that would be easy to get to, making it a quick job since they knew where to find the money. Soto then returned the revolver to the air filter compartment, closed the hood of the car and they left. About an hour later, Bionghi heard sirens and a helicopter.

Calvillo testified about the events before the meeting with Bionghi and those leading up to the robbery defendants committed. With Soto driving, she and Soto went to defendant's home in La Puente. There, Soto spoke with defendant in the front yard while Calvillo remained in the car, unable to hear them. Ramirez then arrived, and he, Soto and defendant got into Calvillo's car. Soto drove to Bionghi's house where they picked up Lopez. When they left Bionghi, Soto drove a short distance and stopped. Calvillo did not know where they were going, and she did not ask him.

Regarding their conversation during this short drive, Calvillo "just remember[s] them saying something about some liquor store and them saying—I'm not sure if it was even a store. I don't remember. I don't remember what. But I just remember them saying something and [defendant] was saying, no, that he didn't want to go, and [she asked], [']Okay, what are you guys talking about?['] And they were like, [']No, don't worry about it.['] And then when he stopped somewhere and asked him, what, what was he doing, and he said he was going to just check something out." Calvillo explained that Soto said something

4

about knowing "that tax place" with a "clear box of money" and that "they were just going to go inside just to check it out and they would be right out."

Soto then parked in a residential area, the defendants all got out and Calvillo remained in the front passenger seat, worried about what Soto had said about a box of money. Calvillo thought of leaving, and about five minutes after they had gone, she turned the car around and started to drive away.

### *The robbery, murder and assault*

Camilo Castro testified regarding the robbery that took place on August 20, 2002, in the bookkeeping and income tax business he operated with his sister Carmen Castro.[2] In addition to his tax service, Camilo did charity work, and there was a large box in the office that clients used to donate money. The collection box was in the front of the lobby near the front door. That day, Camilo was in his office, at the rear of the building, with Maria Lagos and her teenage brother Luis. Camilo's sister Carmen was in her office, in the front of the building immediately to the right after entry through the front door. The donation box was in the lobby, next to the door to Carmen's office.

Camilo heard two or more gunshots in quick succession coming from the front of the business about 3:30 p.m. He did not hear his sister's voice. Almost immediately after the gunshots, a man holding a gun appeared at Camilo's office door and ordered him, Maria and Luis to get under the desk. The gunman then tried to break the phone on Camilo's desk and asked for cell phones. Camilo pointed to his desk, and when Maria said hers

---

[2] After first mention whenever two people named in this opinion share a last name, we will use their first names to avoid confusion. No disrespect is intended.

was in her purse, he took her keys, phone and wallet. The gunman then ordered them to stay where they were and left the office. While the gunman was there, Camilo heard a commotion from the front of the lobby. He heard banging noises, which he later learned was the sound of a fax machine being dropped on top of the donation box. He heard no voices.

Not long after the noise stopped, Camilo called out and receiving no reply, he went to check on Carmen. The robbers were gone, and he found Carmen dead at her desk. Camilo went out and saw his neighbor Charles Visitor on the phone with the police.

Maria testified she was in the back office when she heard the front door open, a slam, and a noise like a surprised sort of scream from Carmen. Maria moved her head to see the door and saw three men. One was walking toward the back office with a gun. She could not tell where the two men behind him went.

Luis testified that he was in the back office with Camilo and his sister Maria when he heard three gunshots followed by a slight scream and another gunshot. Luis was also able to see a man in the front of the business holding a chrome-colored handgun pointed toward Carmen's office.

Visitor ran the business adjacent to Camilo, whom he had known for 19 years. He testified that at 3:30 p.m. on August 20, 2002, he was working and heard four loud bangs in rapid succession that sounded like gunshots. He went out his front door to look around. Everything looked normal, so he walked back toward his office past Camilo's lobby door. As he passed, he heard a sound like furniture falling or being tossed around. Thinking Camilo was moving something and needed help, he opened the front door. As he entered the lobby, he saw a man he

later identified as defendant, standing near Carmen's office to the right about four feet into the lobby. Their eyes met. Visitor then saw two other men squatting on the floor picking up scattered money. Fearing a robbery was in progress, Visitor backed up to leave, but was grabbed by the wrist by defendant, who tried to pull him back in. Visitor kept pulling away, they struggled, and Visitor was able to pull defendant outside the building. There, defendant pinned Visitor against the window, saying, "Get back inside, get back inside." Visitor replied, "No, no." As they continued to struggle defendant tried to get something out of his unzipped sweat jacket. Visitor could not be certain, but he thought the object had a square handle and was a firearm, specifically a "millimeter type weapon," not a revolver. When defendant got the object in his hand, he struck Visitor in the left shoulder, grazing his cheek.

Defendant then ran away and a second man, whom Visitor identified as Soto, came out of the building. Soto hit Visitor's head with something after Visitor defensively leaned forward. Soto then ran in the same direction as had defendant. A third man then came out of the building and ran past Visitor in the same direction. Visitor was unable to identify the third man. Visitor ran to a vehicle parked nearby and asked its occupant to call the police.

### Postrobbery

As Calvillo had turned the car around and was starting to drive away, defendants came running and jumped into the car. Calvillo testified that as she drove to her house, the defendants all talked about what they had just done, and they all had money in their pockets. Soto said he had shot a woman because she screamed and yelled for her brother, after Soto had told her,

7

"Shut up, shut up." Calvillo testified that "they" were asking Soto, "Why did you shoot her?" He replied, "I hit her and she still wouldn't shut up." While she drove, Calvillo saw that Soto had a long silver gun and Lopez had a black gun. They all said there would be no fingerprints because they wore latex gloves, which they threw out the car window onto the freeway. Lopez also had a purse, which he said he took from a woman, including her license and credit cards, which he tossed out of the car as well.

**Petition for resentencing**

Effective January 1, 2019, the Legislature amended the laws pertaining to felony murder and murder under the natural and probable consequences doctrine, "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The Legislature also added section 1172.6, which provides a procedure for persons convicted of murder to seek retroactive relief if they could not be convicted under sections 188 and 189 as amended effective January 1, 2019. (*People v. Lewis* (2021) 11 Cal.5th 952, 957.) In January 2019 defendant filed a petition to vacate his murder conviction and for resentencing under the statute.

As relevant here defendant's petition set forth the three conditions to eligibility for resentencing: (1) he was charged with murder under a theory of felony murder; (2) he was convicted of murder; and (3) he could not presently be convicted of murder because of changes to section 189, effective January 1, 2019. (See § 1172.6, subd. (a).) The trial court summarily denied the petition, and defendant appealed. We found that defendant had

8

satisfied the initial prima facie showing required for relief, reversed the order, and remanded the matter to the trial court for further proceedings. (See *People v. Quintero* (May 20, 2020, B299193) [nonpub. opn.].)

On remand, the trial court entertained briefing from both sides and held an evidentiary hearing pursuant to section 1172.6, subdivision (d) for the prosecutor to prove beyond a reasonable doubt that defendant remained guilty of felony murder under section 189, as amended effective January 1, 2019. (See § 1172.6, subd. (d).) The court reviewed the information, the abstract of judgment, the preliminary hearing and trial transcripts, jury instructions, and the Court of Appeal decisions. After hearing the argument of counsel, the trial court analyzed the evidence using guidelines set forth in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) and found beyond a reasonable doubt that defendant was a major participant and acted with reckless disregard for human life in the robbery during which the murder was committed. Concluding that defendant thus remained guilty of murder under the amended statues, the court denied the petition.

Defendant filed a timely notice of appeal.

## DISCUSSION

### I. *Banks* and *Clark*

We do not disagree with defendant's contention that a jury's true finding of the special circumstance here (§ 190.2, subd. (a)(17)) does not preclude relief under section 1172.6 as a matter of law. (See *People v. Strong* (2022) 13 Cal.5th 698, 710, 716-717 (*Strong*).) Here, the trial court did not base its decision on the

9

jury's special circumstance finding, nor does defendant claim that it did.

Prior to 2019, at the time of defendant's trial, when an accomplice killed another during an inherently dangerous felony such as robbery, an aider and abettor of the robbery could be convicted of murder without a showing of intent to kill or implied malice. (*Strong*, *supra*, 13 Cal.5th at pp. 704, 707.) Effective 2019, the Legislature amended section 189, subdivision (e) to limit felony murder liability to actual killers, aiders and abettors with the intent to kill, or major participants in the underlying felony who acted with reckless indifference to human life as described in section 190.2, the statute defining the felony-murder special circumstance. (*Strong*, at pp. 707-708.)

In *Strong*, the California Supreme Court held that its decisions in *Banks* "substantially clarified the law surrounding major participant findings," and that *Clark* "then substantially clarified the relevant considerations for determining whether a defendant has acted with reckless indifference to human life." (*Strong, supra*, 13 Cal.5th at p. 721.) Thus, the court concluded that "[s]ection 1172.6 offers resentencing for petitioners who have not been determined beyond a reasonable doubt to have the degree of culpability now required for a murder . . ."; and a jury's true finding that a defendant was a major participant in an underlying dangerous felony who acted with reckless indifference to human life, if made prior to *Banks* and *Clark*, will not compel a finding that the required degree of guilt has been determined beyond a reasonable doubt. (*Strong, supra*, at pp. 720-721.)

The reckless indifference requirement was first articulated in *Tison v. Arizona* (1987) 481 U.S. 137 and *Enmund v. Florida*

10

(1982) 458 U.S. 782 in relation to the imposition of the death penalty.

In *Banks* and *Clark*, when the California Supreme Court clarified the definitions of major participant and reckless indifference to human life, the court suggested relevant considerations for the trier of fact in making that determination. "No one of these considerations is necessary, nor is any one of them necessarily sufficient" (*Banks, supra*, 61 Cal.4th at p. 803); what matters is the totality of the circumstances (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*)).

The factors used to determine whether the defendant was a major participant include the role played by the defendant in planning the underlying crime; the role defendant had in supplying or using a lethal weapon; the awareness of the defendant of the particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants; the defendant's presence at the scene of the killing; and the defendant's action after lethal force was used. (*Clark, supra*, 63 Cal.4th at p. 611; *Banks, supra*, 61 Cal.4th at p. 803; see *Scoggins, supra*, 9 Cal.5th at p. 677.)

With regard to reckless indifference to human life *Banks* explained it as engaging in a felony known to carry a grave risk of death while ""*subjectively* aware that his or her participation in the felony involved a grave risk of death."" (*Banks, supra*, 61 Cal.4th at pp. 801, 807.) Thus, "felony murderers . . . , who simply had awareness their confederates were armed and armed robberies carried a risk of death, lack the requisite reckless indifference to human life" (*id*. at p. 809) because "only knowingly creating a 'grave risk of death' satisfies the constitutional minimum" (*id*. at p. 808) articulated by the United States

11

Supreme Court in *Tison v. Arizona, supra*, 481 U.S. at page 158 and *Enmund v. Florida, supra*, 458 U.S. at page 798.

In *Scoggins*, our Supreme Court gleaned factors from *Banks* and *Clark* to guide the determination whether the defendant was subjectively aware that his participation involved a grave risk of death.

## II.  Standard of review

Defendant contends that our review should be de novo.  We disagree and review the trial court's determination at the evidentiary hearing pursuant to section 1172.6, subdivision (d) for substantial evidence.  (*People v. Garrison* (2021) 73 Cal.App.5th 735, 747; see *People v. Ramirez* (2021) 71 Cal.App.5th 970, 985.)

Defendant argues that the review should be de novo because the facts presented at the evidentiary hearing were undisputed and the trial court made no findings of fact.  To support these contentions, defendant quotes the court: "There doesn't seem to be any disputed factual questions as to matters outside the trial record"; and "I'm not resolving any disputed fact."  Defendant seemingly concludes that this appeal involves the application of law to undisputed facts, and thus a de novo standard of review should be applied to determine whether the prosecution met its burden to prove that defendant would still be guilty of murder under the amended statutes.  However, defendant's quotes are taken from the court's ruling on his petition for habeas corpus, which was heard the same day, and in which the defense sought to have the robbery-murder special circumstance stricken on the ground that it was not supported by

12

substantial evidence.[3]  Defendant has raised no issue here pertaining to his petition for writ of habeas corpus.  The trial court's comments are thus irrelevant.

We also disagree with defendant's assertion that the trial court did not engage in factfinding.  As defendant was not the actual killer and no evidence suggested that he shared Soto's intent to kill Carmen, the mental state required to convict him of felony murder under section 189 as amended was "reckless indifference to human life, as described in subdivision (d) of Section 190.2."  (§ 189, subd. (e)(3).)  "'Evidence of a defendant's state of mind is almost inevitably circumstantial . . . .'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)  State of mind is thus "a question of fact based upon reasonable inferences." (*People v. Hewlett* (1951) 108 Cal.App.2d 358, 377.)  Here, by resolving disputed inferences drawn from the facts, the trial court indeed engaged in factfinding, to which we apply a substantial evidence standard of review.

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  "The same standard applies when the conviction rests primarily on circumstantial evidence."

---

[3]     The court had already ruled with regard to the section 1172.6 petition that the record of conviction showed beyond a reasonable doubt that defendant had been a major participant in the robbery and acted with reckless disregard for human life.

13

(*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "[B]ecause 'we *must* begin with the presumption that the evidence . . . *was* sufficient,' it is defendant, as the appellant, who 'bears the burden of convincing us otherwise.'" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1430.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conclusion of the trier of fact].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

## III. Finding of major participant and supporting evidence

The trial court was guided by CALJIC No. 8.21, which defines and explains the required elements of first degree felony murder under current section 189 and includes factors suggested by *Banks* and *Clark* for determining the major participant and reckless disregard requirements under that statute.

Defendant argues that a review of the factors show that although his participation in the robbery was greater than the participation of the getaway driver in *Banks*, it was not significantly greater.[4] In addition, the evidence did not show that the driver had a role in planning the robbery, or, although he and

---

[4] In *Banks*, the getaway driver was absent from the scene, sitting and waiting in a car three blocks from the murder scene, with no evidence that he saw or heard the shooting or that he could have, that he had any immediate role in instigating the murder, or that he could have prevented it. (*Banks, supra*, 61 Cal.4th at p. 805.)

his cohorts were gang members, that they had ever committed any other violent crime. (*Banks, supra*, 61 Cal.4th at p. 805.) "[He] was, in short, no more than a getaway driver." (*Id*. at p. 806.)

Defendant was not a mere getaway driver and cannot be compared to one, following review of the relevant findings and evidence relating to whether defendant was a major participant in the robbery. (See *Scoggins, supra*, 9 Cal.5th at p. 677; *Clark, supra*, 63 Cal.4th at p. 611; *Banks, supra*, 61 Cal.4th at p. 803.)

### A.    *Planning*

The court found that circumstantial evidence of defendant's part in the planning of the robbery consisted in part of his disagreement with targeting a liquor store, but his agreement to go to the tax office, and the use of latex gloves by all defendants. In addition, all three robbers immediately spread out to a specific area, indicating preplanned roles. The court also noted that after shots were fired, defendant's focus was on the cash box, suggesting this was his preplanned job.

As the People point out, the record shows additional circumstantial evidence from which a reasonable inference supports the idea that defendant had participated in planning the robbery: his conversation with Soto in defendant's front yard, the arrival of Ramirez, and then meeting up with Lopez at Bionghi's house, where defendant and his accomplices stood within hearing distance while Soto showed Bionghi three guns and attempted to enlist him as the getaway driver.

Defendant has not shown that the court's inferences were unreasonable. Instead, he contends that there was *no* evidence of his role in planning the robbery because he said to his codefendants that he wanted no part in the robbery and that he

15

objected to going along. Defendant misinterprets the testimony and the court's finding. The trial court's finding was as follows: "The defendant disagreed with the robbery of the tax office. Certainly went along with the—disagreed with the liquor store and agreed with the tax office." We construe the court's first sentence as a mistake which the court corrected in the second sentence, as Calvillo testified as follows: "I just remember them saying something about some liquor store and them saying . . . I don't remember what. But I just remember them saying something and [defendant] was saying, no, that he didn't want to go . . . ." Calvillo then asked, 'Okay, what are you guys talking about?' And they were like, 'No, don't worry about it . . ." and then Soto drove to the tax office.

A reasonable interpretation of the testimony and the court's finding is that defendant objected to the liquor store but not to the tax office.[5]

### B. *Supplying, using or awareness of lethal weapons*

The court did not find that defendant had a role in supplying the firearms, but inferred he was aware lethal weapons would be used from testimony of Maria and Luis that two of the robbers were seen with guns drawn as they entered the business.

---

[5] Defendant also contends that although he was aware of the plan there was no evidence that he conceived or helped create the plan. In arguing this contention defendant cites evidence that Soto sought out Bionghi as the getaway driver and Lopez explained the plan to the others on the way to the tax office. Defendant then infers that Soto and perhaps Lopez were the masterminds of the crime and concludes that this factor weighs in his favor. We may not reweigh the evidence. (See *People v. Maxwell* (1979) 94 Cal.App.3d 562, 576.)

16

The court also inferred that defendant had a gun or other weapon in his pocket, as Visitor testified to having felt the outline of a gun in defendant's pocket that was heavy, had a square handle, was not a revolver but a "millimeter type" gun, which was then used to strike Visitor. We note that Visitor also testified that he thought defendant took a handgun out of his pocket because he caught a glimpse of the object as it came toward him, which appeared to be a weapon. Thus, the court could reasonably infer that defendant was aware that three weapons were used in the robbery, the two other robbers entered with guns drawn and defendant used a third object as a weapon.

Defendant appears to suggest that the more reasonable inference from Visitor's testimony is that it was not a gun in defendant's pocket because, although Visitor thought it was a gun, he said he "couldn't tell exactly what it was." However, that "'the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment.'" (*In re V.V.* (2011) 51 Cal.4th 1020, 1026.) And as we find the court's inferences to be logical and supported by circumstantial evidence, we accept them, as we must. (See *People v. Maury, supra*, 30 Cal.4th at p. 396.)

### C. *Presence at the scene and action after lethal force*

The trial court found defendant was at the scene either in the same room as the shooter or in the next room; noted that Maria had seen defendant and Soto standing in the same room; as well as evidence of the robbers' immediate spreading out to a different area, indicating a planned action. The court found that after lethal force was used, defendant continued to collect the money, and attacked Visitor. From this the court inferred that

17

defendant intended to prevent Visitor from escaping or calling 911. The court added that "defendant left with the money, no help, no report, no nothing."

Defendant concedes it is reasonable to infer that gunshots were heard. He also concedes that he was busy with the charity box. Thus, raising a reasonable inference that defendant was too focused on the money to render aid as the trial court found. When viewing the evidence in a light most favorable to his position and drawing contrary inferences, defendant argues that the evidence shows that he was not present in Carmen's office and not in a position to prevent the unforeseen shooting, as he was occupied with breaking into the donation box. Defendant assumes that Carmen's office and the charity box were a certain distance from the front door, that defendant was already busy with the box when Soto shot Carmen, and that he could not see or have prevented *any* of the violence perpetrated upon her, whether by beating or shooting. He has not, however, cited to the record for evidence of his assumptions.

Substantial evidence does support a reasonable inference that defendant was in Carmen's office when Soto beat and shot her or was at least very close to Soto at one or both of those times. Camilo testified that Carmen's office was located toward the front of the building, to the right and just four feet in from the front door entry, and the charity box was next to the door of her office. Maria testified that she looked into the lobby *as soon as* she heard the front door slam and a scream from Carmen, saw all three men who had entered, with Lopez in front coming toward her and the other two standing behind him. Luis testified that he was focused on counting tickets, looked up *after* he heard gunshots, saw a man in the front of the business holding a

18

chrome-colored handgun pointed toward Carmen's office, and saw Lopez entering the back office pointing a gun. Soto told the others that he hit Carmen first and then shot her when she would not "shut up," and he had a long silver-colored gun. Thus, in the time it took for Lopez to walk from the lobby just after the robbers entered the back office door, Soto had beaten Carmen, had fired several shots in her direction, and he either shot her from the lobby or he had quickly backed out of her office after firing. If defendant was busy with the cash box, he was most likely very close to Soto much of this time.[6]

It is defendant's burden to support his points with an adequate record and to affirmatively demonstrate error. (See *People v. Whalen* (2013) 56 Cal.4th 1, 84, disapproved on another point in *People v. Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17.) Error is never presumed from a silent record. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

Defendant concludes that "on balance" it cannot be said that substantial evidence supports a finding beyond a reasonable

---

[6] The distance between the lobby, Carmen's office door, and the charity box would have been clear to the trial court as People's exhibit 8 included a floor plan of the business and a photograph of the charity box in its normal position in the lobby. Using the floor plan, Camilo explained where the entrance door, lobby, cash box and the back office were in relation to Carmen's office. The trial exhibits, which were not in the appellate record in appeal No. B170919, were not mentioned in the footnote of defendant's opening brief requesting judicial notice of the reporter's and clerk's transcripts in that appeal.

In addition, defendant's footnote request for judicial notice fails to comply with California Rules of Court, rules 8.224 and 8.320.

doubt that defendant was a major participant under a *Banks* analysis. We disagree and again note that the weight to be given to evidence is the province of the trier of fact (*People v. Maxwell, supra*, 94 Cal.App.3d at p. 576); the trial court was not required to find all suggested factors (see *Banks, supra*, 61 Cal.4th at p. 803). Furthermore, our task is to determine whether substantial evidence supports the trier of fact's finding, not whether substantial evidence supports a contrary finding, as defendant has argued here. (See *People v. Saterfield* (1967) 65 Cal.2d 752, 759.) We conclude that it does.

## IV.    Reckless indifference

"Reckless indifference to human life has a subjective and an objective element. (*Clark, supra*, 63 Cal.4th at p. 617.) As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' (*Banks, supra*, 61 Cal.4th at p. 801; see *Clark*, at p. 617.) As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'" (*Clark*, at p. 617, [citation].) 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death"' satisfies the statutory requirement. (*Banks*, at p. 808.) Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference

20

to human life. (*Ibid.*; see *Clark*, at p. 623.)" (*Scoggins, supra*, 9 Cal.5th at p. 677.)

The trial court's findings and evidence overlap with most of the factors articulated by the California Supreme Court following *Banks* and *Clark* as demonstrating subjective awareness that participation in the underlying felony involved a grave risk of death. (See *Scoggins, supra*, 9 Cal.5th at p. 677, citing *Clark, supra*, 63 Cal.4th at pp. 618-623.) Those findings include: defendant used a weapon when he hit Visitor; he knew that three weapons, including at least two firearms would be used by the three robbers present, increasing the likelihood of lethal force; three weapons were ultimately used in the robbery; defendant was physically present at the crime and had the opportunity to mitigate the risk of violence and aid the victim; defendant was focused on the money and made no effort to minimize the risks of violence during the robbery or to render aid to Carmen; defendant increased the violence by attacking Visitor, striking him with a hard blunt weapon, and attempting to force Visitor back into the building where his two armed accomplices remained, one of whom defendant knew had shot Carmen.

The only two of the factors enumerated in *Scoggins* that are not shown by the trial evidence are a lengthy duration of the interaction between the robbers and their victims and defendant's knowledge of his accomplices' propensity for violence.[7] (See *Scoggins, supra*, 9 Cal.5th at p. 677.) However,

---

[7] Defendant takes issue with the trial court's finding that because the defendants were all gang members and the record was "replete" with discussions of taking out witnesses, circumstantial evidence showed a willingness to use force or violence. We agree with defendant that gang membership alone

21

defendant certainly knew his own propensity for violence, and he displayed a callous disregard for human life when, standing just outside Carmen's office, he attempted to pull Visitor back inside, knowing his cohorts were inside and armed, and that one had shot Carmen. Defendant also displayed a disregard for human life with his attack on Visitor with a hard blunt object and then leaving the scene "with the money, no help, no report, no nothing," as described by the trial court.

Considering the totality of the circumstances, we conclude that substantial evidence supports the trial court's finding that defendant was a major participant in the robbery and acted with reckless disregard for human life, such that a rational trier of fact could find beyond a reasonable doubt that defendant remains guilty of felony murder under section 189 as amended effective January 1, 2019.

---

does not show a propensity for violence, as there must also be evidence that defendant or his accomplices had previously engaged in violent crime. (See *Banks, supra*, 61 Cal.4th at pp. 810-811.) It did not do so here.

Defendant also asserts that any discussion of taking out a witness took place after the crime and thus could not show propensity prior to the crime. The court was apparently referring to recorded discussions between defendant and Soto while sharing a jail cell after their arrest. In essence, Soto asked defendant to tell his cousin to contact "Gooney" because a witness needed "to be tooken care of," and Soto knew "Gooney could take somebody out . . . ." Defendant gave mostly noncommittal responses such as "Yeah." We agree that the conversation did not show defendant's propensity for violence, although it may have suggested Soto's prior experience with Gooney in that regard.

**DISPOSITION**

The order denying the section 1172.6 petition is affirmed.

_____

CHAVEZ, J.

We concur:

_____

LUI, P. J.

_____

HOFFSTADT, J.